IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| CENTRALSQUARE | ) | |
| TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No.** _____ |
| V. | ) | |
| | ) | |
| ORACLE AMERICA, INC. and | ) | |
| ORACLE CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL</u>

Plaintiff CentralSquare Technologies, LLC ("CentralSquare"), headquartered in Lake Mary, Florida, by and through counsel, files this Complaint against Defendant Oracle America, Inc. and Defendant Oracle Corporation (collectively, "Defendants" or "Oracle") based upon Oracle's targeted raiding of CentralSquare's employees in an effort to obtain CentralSquare's confidential information and trade secrets, in violation of law and CentralSquare's employees' agreements. CentralSquare alleges as follows:

### *THE PARTIES*

1.     Plaintiff CentralSquare is a limited liability company organized under the laws of Delaware with its principal place of business in Lake Mary, Florida.

Among other business ventures, CentralSquare is an established market leader in the design, development, marketing, and sales of public safety and public justice software throughout the United States.

2.      Defendant Oracle America, Inc. is a for-profit corporation organized under the laws of Delaware with its principal place of business at 500 Oracle Parkway, Redwood Shores, California.

3.      Defendant Oracle Corporation is a for-profit corporation organized under the laws of Delaware with its principal place of business at 2300 Oracle Way, Austin, Texas.

4.      Defendant Oracle America, Inc. and Defendant Oracle Corporation (collectively, "Defendants" or "Oracle") are related entities that provide computing infrastructure products and services worldwide.   For fiscal year 2020, Oracle Corporation's total revenues were $39.1 billion.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction over this action under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.* (the "DTSA"), pursuant to 28 U.S.C. § 1331.

6.      This Court has supplemental jurisdiction over CentralSquare's state claims pursuant to 28 U.S.C. § 1367, as they are related to the claims over which

this Court has original jurisdiction such that they form part of the same case or controversy under Article III of the United States Constitution.

7.     This Court has personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193(1) because Oracle America, Inc. is registered to do business in Florida, Defendants regularly conduct business within this state and district; Defendants have wrongly interfered with agreements executed in Lake Mary, Florida; Defendants hired David Castleton in Lake Mary, Florida; Mr. Castleton works for Defendants in Lake Mary, Florida; Defendants' actions will harm CentralSquare (which has its headquarters in Lake Mary, Florida) within this district; and the CentralSquare information and other property and rights at issue are situated within this district.

8.     This Court's exercise of personal jurisdiction over Defendants is consistent with the Constitutions of the United States and the State of Florida.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to CentralSquare's claims occurred in this District.

## BACKGROUND

### CentralSquare's Business

10.     CentralSquare is a leader in the design, development, and marketing of public safety and public administration software, serving over 7,500 public sector organizations across North America.

11.    CentralSquare has developed unique products for public justice agencies (such as police departments) including public safety solutions related to 911, dispatch, records, mobile and jail.  CentralSquare refers to its business unit that covers this sector as its "Public Safety and Justice Unit."

12.    CentralSquare derives approximately two-thirds of its revenue and approximately three quarters of its customers from its Public Safety and Justice Unit.

13.    CentralSquare has over 5,000 public agency customers that utilize its public safety and justice offerings.

14.    According to the former head of CentralSquare's Public Safety and Justice Unit, Steve Seoane, CentralSquare is the "#1 Public Safety software provider in the US."    (Steve Seoane's LinkedIn Profile, publicly available at https://www.linkedin.com/in/steveseoane/.)

15.    For the niche public safety and justice market, CentralSquare, at great expense, has developed unique products, specific marketing strategies and plans, and distribution networks and customer relationships which are highly specialized and confidential.

16.    Among CentralSquare's innovative public safety and justice products is its Public Safety Suite Pro, the world's first plug-and-play public safety suite. Oracle's hiring has been targeted at CentralSquare employees who have intimate knowledge of this product.

17.     CentralSquare enjoys a significant competitive advantage over its competitors in the public safety and justice software industry in part due to its Public Safety Suite Pro product.

18.     CentralSquare's leaders, engineers, and software architects have obtained specialized skills and knowledge in the public safety and justice software industry obtained through the years of experience and the investments and efforts of CentralSquare and its predecessors.   This has come at significant cost to CentralSquare.

### *Oracle's Business*

19.     Oracle designs, manufactures, and markets network computing infrastructure solutions to businesses in the U.S. and around the world.  Although Oracle offers services and products in numerous business sectors and is a competitor of CentralSquare in other sectors, historically, it has had very little success or involvement in the public safety and justice sector.

20.     Oracle has a smaller market share in the public safety and justice sector than CentralSquare.  Oracle is not currently servicing anywhere near the over 5,000 public sector organizations serviced by CentralSquare's Public Safety and Justice Unit.

***Oracle's Raiding of CentralSquare's Public Justice and Safety Employees
Over the Last Year to Build Its Public Safety and Justice Business***

21.     In or about June of 2020, in an effort to strengthen and grow its small public safety and justice business, Oracle began targeting, recruiting and hiring key CentralSquare employees who are devoted to the Public Safety and Justice Unit, including executives, engineers, and designers, all of whom have agreements with CentralSquare containing various restrictive covenant obligations. Based on Oracle's actions to date, it appears that Oracle is seeking to build and expand its public safety and justice organization primarily at CentralSquare's expense by targeting and hiring away CentralSquare employees in various key executive and technical roles. In doing so, Oracle has improperly acquired or will acquire confidential and trade secret knowledge of CentralSquare such that Oracle will be able to "leapfrog" its public safety business in a way that would not be possible but for its targeting and hiring away of key employees from CentralSquare.

22.     In or about June of 2020, Oracle hired Steve Seoane, CentralSquare's former President and General Manager of the Public Safety and Justice Unit, to become Senior Vice President.

23.     Mr. Seoane separated from CentralSquare in early April 2020.  As described below, Mr. Seoane oversaw the Public Safety and Justice Unit's operations and strategy while employed at CentralSquare.  He has intimate knowledge of CentralSquare's trade secrets and confidential information, including

6

as to its product offerings. Mr. Seoane also served as CentralSquare's "go to" contact with some of CentralSquare's largest and most important customers.

24. As part of his separation from CentralSquare, Mr. Seoane agreed to a separation agreement. During the negotiations of his separation agreement, CentralSquare became aware that Mr. Seoane was considering employment with Oracle. In response to CentralSquare's repeated inquiries as to whether Mr. Seoane intended to work for Oracle, Mr. Seoane gave only evasive answers and would not confirm his intentions.

25. Mr. Seoane received an initial payment from CentralSquare per the terms of his separation agreement on June 19, 2020. Mr. Seoane accepted this payment with full knowledge of his new employment with Oracle and of CentralSquare's reservations about him joining Oracle as a competitor.

26. Mr. Seoane began working for Oracle in June of 2020 as its Senior Vice President. Upon information and belief, Mr. Seoane's current title is Senior Vice President, Government Sector. Mr. Seoane failed to notify CentralSquare of his position with Oracle in violation of his contractual obligations.

27. Further, Oracle continued its raiding of key CentralSquare employees. Upon information and belief, this was done at Mr. Seoane's direction in his capacity as Senior Vice President at Oracle.

28.    After Mr. Seoane joined Oracle, a number of CentralSquare employees whom he directly supervised or with whom he worked closely at CentralSquare's Public Safety and Justice Unit began leaving CentralSquare to join Defendants.

29.    These included multiple CentralSquare senior leaders, product designers, engineers, and sales employees.

30.    In October of 2020, Defendants hired Sean McCarthy, CentralSquare's Senior Vice President of Strategy and Corporate Development, to become its Vice President of Products.

31.    In November of 2020, Defendants hired David Castleton, CentralSquare's Vice President and head of Public Safety and Justice Product Management and former Vice President and head of Design and User Experience, to become Vice President of GBU User Experience.  During his employment with CentralSquare, Mr. Castleton reported directly to Mr. Seoane.

32.    In February of 2021, Defendants hired Brett Marshall, former Manager and Lead of Public Safety and Justice Products design/principle at CentralSquare, to become a Principal User Experience Designer.  Mr. Marshall reported directly to Mr. Castleton prior to Mr. Castleton's departure for Oracle.

33.    Defendants appear to have continued their hiring of CentralSquare's key employees by its suspected hiring of Zac Bradish, CentralSquare's Regional Sales Director, in or about March of 2021.

34.    In May of 2021, Oracle induced Austin Hanson, Senior Software Architect at CentralSquare in Sioux Falls, South Dakota, to quit his position with CentralSquare to serve as a Principal Software Engineer at Oracle in Sioux Falls, South Dakota.  Mr. Hanson works directly on CentralSquare's Public Safety and Justice products.  Oracle targeted Mr. Handson despite the fact that he has enforceable non-compete obligations to CentralSquare.  Upon information and belief, Oracle significantly raised Mr. Hanson's salary to an above-market salary in order to induce him to resign from CentralSquare and join Oracle.

35.    Oracle appears to be targeting CentralSquare engineers from its office in South Dakota.  Oracle knows that CentralSquare employs all or almost all of the qualified software engineers in South Dakota and other Public Safety and Justice development and design centers who can immediately service the public safety and justice sector.  Oracle is only seeking to hire CentralSquare engineers from that market.  It is not advertising for any roles in that market.

36.    CentralSquare attempted to stop Oracle's conduct (and its former employees' breach of their contractual obligations) via multiple correspondences from its counsel to Oracle expressing concern regarding Oracle's hiring of CentralSquare key employees into roles in which they would apparently be directly competing against CentralSquare, soliciting CentralSquare's customers for competitive services, and making use of CentralSquare's confidential and

proprietary information.  Despite Oracle providing vague assurances, it has persisted in its efforts to build its public safety organization at CentralSquare's expense. Oracle's counsel's platitudes that Oracle respects the proprietary information of other businesses is contradicted by its actions otherwise.

37.     By targeting and acquiring key employees of CentralSquare's Public Safety and Justice Unit, Oracle has or will gain access to CentralSquare's trade secret and confidential information at all or nearly all of the key roles necessary to build and operate a public safety organization to compete with CentralSquare. It is inconceivable that the employees hired away from CentralSquare will not disclose or rely upon CentralSquare's trade secrets and confidential information to assist Oracle in its apparent efforts to compete with CentralSquare in the public safety and justice sector.

### *Departing Employees' Duties and Agreements with CentralSquare*
### *Steve Seoane*

38.     As President and General Manager of the Public Safety and Justice Unit for CentralSquare, Mr. Seoane oversaw all operations of CentralSquare's Public Safety and Justice Unit.  Mr. Seoane's duties included, but were not limited to, overseeing CentralSquare's strategy in the Public Safety and Justice Unit, product development, employees within the Unit, customer relations, and bids and requests for proposals to existing and prospective customers.  In his role, he received and

helped develop CentralSquare's confidential and trade secret information regarding customer relationships, sales and marketing strategies, pricing, strategic plans, manufacturing processes, compensation and commission strategies, and financial results.   Protecting this information is a legitimate business interest of CentralSquare.

39.   Mr. Seoane is subject to an Employment and Restrictive Covenants Agreement dated November 26, 2018.   A true and correct copy of Mr. Seoane's Agreement is attached hereto as Exhibit A ("**Ex. A**").

40.   By signing his Agreement, Mr. Seoane acknowledged that he would be given use of the Company's "Confidential Information" and that said information is among the most valuable assets of CentralSquare's business.  (Ex. A at ¶ 3(a).)

41.   Mr. Seoane agreed, among other things, that during his employment and at all times following the termination of his employment with CentralSquare he would not use or disclose any Confidential Information other than for the purpose of carrying out his employment for CentralSquare or use or disclose any Confidential Information to third parties.  (*Id.* at ¶ 6(a).)

42.   Mr. Seoane's Agreement defines "Confidential Information" as, among other things, "the Company's investment strategies, management planning information, business plans, operational methods, market studies, marketing plans or strategies, patent information, business acquisition plans, past, current and

planned research and development, formulas, methods, patterns, processes, procedures, instructions, designs, inventions, operations, engineering, services, drawings, equipment, devices, technology, software systems, price lists, sales reports and records, sales books and manuals, code books, financial information and projections, personnel data, names of customers, customer lists and contact information, customer pricing and purchasing information, lists of targeted prospective customers, supplier lists, product/service and marketing data and programs, product/service plans, product development, advertising campaigns, new product designs or roll out, agreements with third parties, or any such similar· information." (*Id.* at ¶ 13(e).)

43.    Mr. Seoane further agreed that during his employment with CentralSquare and for one year following the termination of his employment he would not compete with CentralSquare within the restricted territory. (*Id.* at ¶¶ 8, 13(h), 13(i).)

44.    Mr. Seoane agreed that during his employment with CentralSquare and for one year following the termination of his employment he would not "(either directly or indirectly, by assisting or acting in concert with others), on behalf of himself/herself or any other person, business, entity, including but not limited to on behalf of a Competing Business, call upon, solicit, or attempt to call upon or solicit

any business from any Customer or Prospective Customer for the purpose of providing services substantially similar to the Services." (*Id.* at ¶ 9.)

45.     In addition, Mr. Seoane agreed that he would not, "on behalf of [himself] or any other person, business, or entity (either directly or indirectly, by assisting or acting in concert with others), solicit, recruit, or encourage, or attempt to solicit, recruit, or encourage any of the Company's employees, in an effort to hire such employees away from the Company, or to encourage any of the Company's employees to leave employment with the Company to work for a Competing Business." (*Id.* at ¶ 10.)

46.     Mr. Seoane acknowledged that the obligations set forth in his Agreement are "necessary and reasonable to protect the Company's legitimate business interests in protecting its Confidential Information, Trade Secrets, customer and employee relationships and the goodwill associated therewith." (*Id.* at ¶ 11.)

47.     Mr. Seoane also agreed that the violation or threatened violation of the Agreement would "cause irreparable injury to the Company and that, in addition to any other remedies that may be available in law, in equity, or otherwise, the Company shall be entitled: (a) to obtain injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by Employee, without the necessity of proving actual damages; and (b) to be indemnified by Employee from any loss or harm; and (c) to recover any costs or attorneys' fees,

arising out of or in connection with any breach by Employee or enforcement action relating to Employee's obligations under this Agreement." (*Id.* at ¶ 11.)

48.　　In his Separation Agreement with CentralSquare, Mr. Seoane also acknowledged and agreed that he had "access to trade secrets and other proprietary, confidential information of the Company… including information about employees, developments, business plans, finances, costs, customers, profits, markets, sales, products, services, strategies, decisions, plans, marketing, computer systems, software programs, and other information all of which [Mr. Seoane] agree[s] is highly confidential, not generally known or available to the public or in the public domain, derives independent economic value from not being generally known or available to the public, and which is the subject of reasonable efforts by the Company to maintain its confidentiality[.]" (A true and correct copy of Mr. Seoane's Separation Agreement is attached hereto as Exhibit B ("**Ex. B**").)

49.　　In his Separation Agreement, Mr. Seoane also agreed that the Company was entitled to bring an action in court to obtain a temporary restraining order, injunction, or other equitable relief available in response to any violation or threatened violation of the restrictive covenants set forth in his Employee Agreement. (Ex. B at ¶ 23.)

*Sean McCarthy*

50.     As Senior Vice President of Strategy and Corporate Development for Central Square, Mr. McCarthy served in a strategic role and reported to CentralSquare's General Counsel.  As a senior leader overseeing CentralSquare's Strategy and Corporate Development, Mr. McCarthy received and helped develop CentralSquare's confidential and trade secret information regarding acquisition strategies, customer relationships, sales and marketing strategies, pricing, strategic plans, manufacturing processes, compensation and commission strategies, and financial results.  Protecting this information is a legitimate business interest of CentralSquare.

51.     Mr. McCarthy is subject to an Employment and Restrictive Covenants Agreement dated April 14, 2020. A true and correct copy of Mr. McCarthy's Agreement is attached hereto as Exhibit C ("**Ex. C**").

52.     By signing his Agreement, Mr. McCarthy acknowledged that CentralSquare "has a legitimate interest in protecting its Confidential Information, trade secrets, customer relationships, customer goodwill, employee relationships, and the special investment and training given to [him]."  (Ex. C at ¶ 2.).

53.     Mr. McCarthy agreed, among other things, that during his employment and at all times following the termination of his employment from CentralSquare, for so long as the information remains confidential, he would "not use or disclose

any Confidential Information disclosed to [him] by the Company, other than for the purpose to carry out the Employment for the benefit of the Company[,]" and that he would not "directly or indirectly, use or disclose any Confidential Information to third parties, nor permit the use by or disclosure of Confidential Information by third parties." (*Id.* at ¶ 7(a).)

54.    Mr. McCarthy's Agreement defines "Confidential Information" as, among other things, "the Company's investment strategies, management planning information, business plans, operational methods, market studies, marketing plans or strategies, patent information, business acquisition plans, past, current and planned research and development, formulas, methods, patterns, processes, procedures, instructions, designs, inventions, operations, engineering, services, drawings, equipment, devices, technology, software systems, price lists, sales reports and records, sales books and manuals, code books, financial information and projections, personnel data, names of customers, customer lists and contact information, customer pricing and purchasing information, lists of targeted prospective customers, supplier lists, product/service and marketing data and programs, product/service plans, product development, advertising campaigns, new product designs or roll out, agreements with third parties, or any such similar information." (*Id.* at ¶ 3(e).)

55.     Mr. McCarthy further agreed that during his employment with CentralSquare and for two years following the termination of his employment he would not compete with CentralSquare within the restricted territory.  (*Id.* at ¶¶ 9, 3(h), 3(i).)

56.     Mr. McCarthy agreed that during his employment with CentralSquare and for two years following the termination of his employment he would not "(either directly or indirectly, by assisting or acting in concert with others), on behalf of himself/herself or any other person, business, entity, including but not limited to on behalf of a Competing Business, call upon, solicit, or attempt to call upon or solicit any business from any Customer or Prospective Customer with whom Employee had material contact at the time of Employee's termination or during the preceding twelve (12) months, for the purpose of providing Services substantially similar to those provided by Employee for the Company during the Employment." (*Id.* at ¶ 10.)

57.     In addition, Mr. McCarthy agreed that for two years following the termination of his employment he would not, on behalf of himself "or any other person, business, or entity (either directly or indirectly, by assisting or acting in concert with others), solicit, recruit, or encourage, or attempt to solicit, recruit, or encourage any of the Company's employees, in an effort to hire such employees

away from the Company, or to encourage any of the Company's employees to leave employment with the Company to work for a Competing Business." (*Id.* at ¶ 11.)

58.    Mr. McCarthy acknowledged that the obligations set forth in his Agreement are "necessary and reasonable in order to protect the Company's legitimate business interests." (*Id.* at ¶ 12.)

59.    Mr. McCarthy also agreed that the violation or threatened violation of any of the covenants set forth in the Agreement would "cause irreparable injury to the Company and that, in addition to any other remedies that may be available in law, in equity, or otherwise, the Company shall be entitled: (a) to obtain injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by Employee, without the necessity of proving actual damages; and (b) to be indemnified by Employee from any loss or harm; and (c) to recover any costs or attorneys' fees, arising out of or in connection with any breach by Employee or enforcement action relating to Employee's obligations under this Agreement." (*Id.* at ¶ 12.)

### *David Castleton*

60.    As Vice President and head of Public Safety and Justice Product Management and former Vice President and head of Design and User Experience, Mr. Castleton led the Public Safety and Justice Unit's Lead strategic design initiatives across CentralSquare's public safety and public administration suite of

products.  In this role, Mr. Castleton received and helped develop CentralSquare's confidential and trade secret information regarding its Public Safety and Justice Unit, including product design and improvement, customer relationships, sales and marketing strategies, customer experiences with CentralSquare's products, pricing, strategic plans, and manufacturing processes.  Protecting this information is a legitimate business interest of CentralSquare.

61.     Mr. Castleton is subject to an Employment and Restrictive Covenants Agreement dated May 8, 2020. A true and correct copy of Mr. Castleton's Agreement is attached hereto as Exhibit D ("**Ex. D**").

62.     By signing his Agreement, Mr. Castleton acknowledged that CentralSquare "has a legitimate interest in protecting its Confidential Information, trade secrets, customer relationships, customer goodwill, employee relationships, and the special investment and training given to [him]."  (Ex. D at ¶ 2.)

63.     Mr. Castleton agreed, among other things, that during his employment and at all times following the termination of his employment from CentralSquare, for so long as the information remains confidential, he would "not use or disclose any Confidential Information disclosed to [him] by the Company, other than for the purpose to carry out the Employment for the benefit of the Company[,]" and that he would not "directly or indirectly, use or disclose any Confidential Information to

third parties, nor permit the use by or disclosure of Confidential Information by third parties."  (*Id.* at ¶ 7(a).)

64.    Mr. Castleton's Agreement defines "Confidential Information" as, among other things, "the Company's investment strategies, management planning information, business plans, operational methods, market studies, marketing plans or strategies, patent information, business acquisition plans, past, current and planned research and development, formulas, methods, patterns, processes, procedures, instructions, designs, inventions, operations, engineering, services, drawings, equipment, devices, technology, software systems, price lists, sales reports and records, sales books and manuals, code books, financial information and projections, personnel data, names of customers, customer lists and contact information, customer pricing and purchasing information, lists of targeted prospective customers, supplier lists, product/service and marketing data and programs, product/service plans, product development, advertising campaigns, new product designs or roll out, agreements with third parties, or any such similar information."  (*Id.* at ¶ 3(e).)

65.    Mr. Castleton further agreed that during his employment with CentralSquare and for two years following the termination of his employment he would not compete with CentralSquare within the restricted territory.  (*Id.* at ¶¶ 9, 3(h), 3(i).)

66.     Mr. Castleton agreed that during his employment with CentralSquare and for two years following the termination of his employment he would not "(either directly or indirectly, by assisting or acting in concert with others), on behalf of himself/herself or any other person, business, entity, including but not limited to on behalf of a Competing Business, call upon, solicit, or attempt to call upon or solicit any business from any Customer or Prospective Customer with whom Employee had material contact at the time of Employee's termination or during the preceding twelve (12) months, for the purpose of providing Services substantially similar to those provided by Employee for the Company during the Employment." (*Id.* at ¶ 10.)

67.     In addition, Mr. Castleton agreed that for two years following the termination of his employment he would not, on behalf of himself "or any other person, business, or entity (either directly or indirectly, by assisting or acting in concert with others), solicit, recruit, or encourage, or attempt to solicit, recruit, or encourage any of the Company's employees, in an effort to hire such employees away from the Company, or to encourage any of the Company's employees to leave employment with the Company to work for a Competing Business."  (*Id.* at ¶ 11.)

68.     Mr. Castleton acknowledged that the obligations set forth in his Agreement are "necessary and reasonable in order to protect the Company's legitimate business interests."  (*Id.* at ¶ 12.)

69.     Mr. Castleton also agreed that the violation or threatened violation of any of the covenants set forth in the Agreement would "cause irreparable injury to the Company and that, in addition to any other remedies that may be available in law, in equity, or otherwise, the Company shall be entitled: (a) to obtain injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by Employee, without the necessity of proving actual damages; and (b) to be indemnified by Employee from any loss or harm; and (c) to recover any costs or attorneys' fees, arising out of or in connection with any breach by Employee or enforcement action relating to Employee's obligations under this Agreement." (*Id.* at ¶ 12.)

### Brett Marshall

70.     As Manager and Lead of Public Safety and Justice Products design/principle for CentralSquare, Mr. Marshall managed the Public Safety and Justice Unit's strategic design initiatives across CentralSquare's public safety suite of products.  Mr. Marshall received and helped develop CentralSquare's confidential and trade secret information regarding its product design and improvement, customer experiences with CentralSquare's products, strategic plans, and manufacturing processes.  Protecting this information is a legitimate business interest of CentralSquare.

71.    While employed by CentralSquare, Mr. Marshall reported to Mr. Castleton.

72.    Mr. Marshall is subject to an Employment and Restrictive Covenants Agreement dated November 2, 2020.  A true and correct copy of Mr. Marshall's Agreement is attached hereto as Exhibit E ("**Ex. E**").

73.    By signing his Agreement, Mr. Marshall acknowledged that CentralSquare "has a legitimate interest in protecting its Confidential Information, trade secrets, customer relationships, customer goodwill, employee relationships, and the special investment and training given to [him]."  (Ex. E at ¶ 2.)

74.    Mr. Marshall agreed, among other things, that during his employment and at all times following the termination of his employment from CentralSquare, for so long as the information remains confidential, he would "not use or disclose any Confidential Information disclosed to [him] by the Company, other than for the purpose to carry out the Employment for the benefit of the Company[,]" and that he would not "directly or indirectly, use or disclose any Confidential Information to third parties, nor permit the use by or disclosure of Confidential Information by third parties."  (*Id.* at ¶ 6(a).)

75.    Mr. Marshall's Agreement defines "Confidential Information" as, among other things, "including any information related to the Company's investment strategies, management planning information, business plans,

operational methods, market studies, marketing plans or strategies, patent information, business acquisition plans, past, current and planned research and development, formulas, methods, patterns, processes, procedures, instructions, designs, inventions, operations, engineering, services, drawings, equipment, devices, technology, software systems, price lists, sales reports and records, sales books and manuals, code books, financial information and projections, personnel data, names of customers, customer lists and contact information, customer pricing and purchasing information, lists of targeted prospective customers, supplier lists, product/service and marketing data and programs, product/service plans, product development, advertising campaigns, new product designs or roll out, agreements with third parties, or any such similar information." (*Id.* at ¶ 13(e).)

76.    In addition, Mr. Marshall agreed that for a period of two years he would not, on behalf of himself or any other person, business, or entity (either directly or indirectly, by assisting or acting in concert with others), solicit, recruit, or encourage, or attempt to solicit, recruit, or encourage any of the Company's employees, in an effort to hire such employees away from the Company, or to encourage any of the Company's employees to leave employment with the Company to work for a Competing Business. (*Id.* at ¶ 10.)

77.    Mr. Marshall acknowledged that the obligations set forth in his Agreement are "necessary and reasonable in order to protect the Company's

legitimate business interests" and that the nonsolicitation obligation are "necessary and reasonable in order to protect the Company's legitimate business interests in protecting its Confidential Information, Trade Secrets, customer and employee relationships, and the goodwill associated therewith." (*Id.* at ¶ 11.)

78.    Mr. Marshall also agreed that the violation or threatened violation of any of the covenants set forth in the Agreement would "cause irreparable injury to the Company and that, in addition to any other remedies that may be available in law, in equity, or otherwise, the Company shall be entitled to (a) obtain injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by Employee, without the necessity of  proving actual damages; (b) be indemnified by Employee from any loss or harm; and (c) recover any costs or attorneys' fees arising out of or in connection with any breach by Employee or enforcement action relating to Employee's obligations under this Agreement" (*Id.* at ¶ 11.)

### *Austin Hanson*

79.    As a Senior Software Architect at CentralSquare, Mr. Hanson designed products for the Public Safety and Justice Unit.  The products Mr. Hanson designed are innovative and market-leading.   Mr. Hanson received and helped develop CentralSquare's confidential and trade secret information regarding its products,

manufacturing processes, and strategic plans. Protecting this information is a legitimate business interest of CentralSquare.

80.   Mr. Hanson is subject to a Confidentiality, Nondisclosure, and Noncompete Agreement dated June 20, 2017, entered into with a predecessor of CentralSquare, Zuercher Technologies, LLC. The Agreement was assumed and assigned to CentralSquare upon the merger and formation of CentralSquare. A true and correct copy of Mr. Hanson's Agreement is attached hereto as Exhibit F ("**Ex. F**").

81.   By signing his Agreement, Mr. Hanson acknowledged that the information he accessed and acquired during the course of his employment was of a confidential and proprietary nature concerning CentralSquare's business. (Ex. F ¶ 1.)

82.   Mr. Hanson's Agreement defines "Confidential Information" as: "including, but not limited to, information pertaining to Company's business practices and financial position, the names, addresses, telephone numbers, and other personal and confidential information of Company's customers and prospective customers, training and operational manuals, trade secret information, information about Company's processes and products, including information relating to research, development, manufacturing, purchasing, accounting, engineering, marketing, selling, servicing, systems, techniques, designs, proprietary inventions, plans,

drawings, policies, and technology, all of which would not be readily available to Employee except for Employee's employment relationship with Company." (*Id.*)

83.   Mr. Hanson acknowledged that "such information and similar data is not generally known to the trade, is of a confidential nature, is an asset of Company, and to preserve Company's goodwill must be kept strictly confidential and used only in the conduct of its business; and if disclosed, the Company would suffer great loss and irreparable injury." (*Id.*)

84.   In his Agreement, Mr. Hanson agreed that during his employment and all times thereafter, he would "maintain the Confidential Information in the strictest confidence" and would not directly or indirectly use, divulge, or otherwise disclose or make available any of the Confidential Information of the Company. (*Id.* at 2.)

85.   Mr. Hanson also agreed that for a period of two years from the date of termination of his employment, within a 150-mile radius of Sioux Falls, South Dakota, he would not engage directly or indirectly in the operation of a business similar to that of the Company. (*Id.* at ¶ 6.)

86.   Mr. Hanson further agreed that for a period of two years from the date of termination of his employment, he would not solicit any existing or prospective customers or employees of the Company. (*Id.* at ¶ 7.)

87.   In addition, Mr. Hanson agreed that during his employment and for a period of two years after the termination of his employment, he would not "attempt

to hire or entice away any employee of Employer or induce any such employee to terminate employment with Employer." (*Id.* at ¶ 8.)

88.     Mr. Hanson also agreed that his breach of any provision of his Agreement would cause the Company "irreparable injury for which there is no adequate remedy at law." (*Id.* at ¶ 10.) Mr. Hanson agreed that in the event of his breach the Company would be entitled to injunctive and/or other equitable relief, in addition to any other remedies available, to require specific performance or prevent a breach of the Agreement. (*Id.*) Mr. Hanson also agreed that in the event of his breach, or if the Company was required to take action to enforce the Agreement, he was liable to pay all costs of enforcement, including attorneys' fees. (*Id.*)

### *Zac Bradish*

89.     As a Regional Sales Director for CentralSquare, Mr. Bradish oversaw and supervised a team of CentralSquare's sales members that marketed and sold CentralSquare's public safety and justice products to public agencies. During his CentralSquare employment, Mr. Bradish directly interacted with CentralSquare government agency customers and prospective customers. As a senior leader, Mr. Bradish received and helped develop CentralSquare's confidential and trade secret information regarding customer relationships, sales and marketing strategies, pricing, strategic plans, compensation and commission strategies, and financial

results.   Protecting this information is a legitimate business interest of CentralSquare.

90.   Mr. Bradish is subject to a Confidentiality, Nondisclosure, and Noncompete Agreement dated August 13, 2012, entered into with a predecessor of CentralSquare, Zuercher Technologies, LLC.  The Agreement was assumed and assigned to CentralSquare upon the merger and formation of CentralSquare.  A true and correct copy of Mr. Bradish's Agreement is attached hereto as Exhibit G ("**Ex. G**").

91.   By signing his Agreement, Mr. Bradish acknowledged that during the course of his employment he received and would receive, contribute to, or have access to confidential and proprietary information of the Company.  (Ex. G ¶ 1.)

92.   He also acknowledged that such information is not generally known, is of a confidential nature, and is an asset of the Company, and to preserve the Company's goodwill must be kept strictly confidential, and if disclosed, the Company would suffer great loss and irreparable injury.  (*Id.*)

93.   Mr. Bradish agreed that during his employment and all times thereafter, he would maintain the Confidential Information in the strictest confidence and would not, without the authorization of the Company, disclose it or make it available to any other person or entity so long as the information remained confidential. (*Id.* ¶ 2.)

94.     Mr. Bradish also agreed that he would not compete with the Company for two years from the termination of his Agreement within a 150-mile radius of Sioux Falls, South Dakota.  (*Id.* at ¶ 6.)

95.     Mr. Bradish further agreed that he would not solicit any existing or prospective customers or employees of the Company for a period of two years after the termination of his Agreement.  (*Id.* at ¶ 7.) He also agreed he would not attempt to hire or entice away any employee of the Company for a two-year period from the date of the termination of his Agreement.  (*Id.* at ¶ 8.)

96.     Mr. Bradish acknowledged that if he breached any provision of the Agreement, the Company would be irreparably injured and would be entitled to injunctive and/or other equitable, in addition to any other available remedies.  (*Id.* at ¶ 10.)  He further agreed that if he breached the Agreement or if the Company is required to take action to enforce the Agreement, he shall pay all costs of enforcement, including attorney's fees.  (*Id.*)

### The Departing Employees' Access to and Knowledge of CentralSquare Proprietary Information

97.     Mr. Seoane, Mr. McCarthy, Mr. Castleton, Mr. Marshall, Mr. Bradish, and Mr. Hanson, (referred to collectively as the "Departing Employees") did in fact receive some or all of the aforementioned confidential and trade secret information of CentralSquare.

98.    In their roles with CentralSquare, the Departing Employees gained intimate knowledge of CentralSquare's products, including their design, development, and specifications.  Disclosure of that information to another company in the industry, or use of the knowledge of those products to compete against CentralSquare, would cause irreparable harm to CentralSquare.

99.    In their roles with CentralSquare, Mr. Bradish, Mr. McCarthy, Mr. Castleton, and Mr. Seoane gained intimate knowledge of CentralSquare's selling and marketing strategies.  Disclosure of those strategies to another company in the industry, or use of the knowledge of those strategies, would cause irreparable harm to CentralSquare.

100.   In their roles with CentralSquare, Mr. Seoane, Mr. Castleton, Mr. Bradish, and Mr. McCarthy gained intimate knowledge of CentralSquare's distribution networks and customer relationships.  Disclosure of these networks and relationships or use of the knowledge of these networks and relationships, would cause irreparable harm to CentralSquare.

101.   In their roles with CentralSquare, Mr. Bradish, Mr. Seoane, and Mr. McCarthy gained intimate knowledge of the CentralSquare salesforce and a high level of influence and credibility over them, as well as over CentralSquare's customers.

102.   In their roles with CentralSquare, Mr. Bradish, Mr. McCarthy, Mr. Castleton, and Mr. Seoane gained intimate knowledge of how CentralSquare employees within their departments were incentivized and compensated, as well as the specific motivating factors and considerations for each employee.  Disclosure of this knowledge or use of this knowledge to facilitate the solicitation of an employee, would cause irreparable harm to CentralSquare.

103.   CentralSquare goes to great lengths to protect its confidential, proprietary and trade secret information.  For example, CentralSquare requires employees and third parties with potential access to such information to sign confidentiality or non-disclosure agreements.  CentralSquare also takes other reasonable and necessary precautions to protect its confidential information and trade secrets from inadvertent or improper disclosure by its employees and former employees.  CentralSquare's computer systems and databases are password-protected.  Only CentralSquare employees have access to CentralSquare's computer systems and databases, and each employee with access has an individual user name and password that he/she must use to gain access.  Additionally, CentralSquare utilizes the "least privileged" approach when assigning access rights to its employees.  CentralSquare provides its employees and even their computer devices access only to the information and resources they need to perform their job duties.  CentralSquare also implements detailed security policies and procedures, including

requiring badges to enter facilities, among other means.  Further, CentralSquare contacted the Departing Employees and reminded them of their confidentiality obligations following their departure.

### *Oracle's Activities are Causing Irreparable Harm to CentralSquare*

104.   Upon information and belief, Oracle is creating, marketing and selling or intends to imminently create, market and sell products that are similar to CentralSquare's Public Safety and Justice Unit products.  Oracle will market and sell or is marketing and selling its products to the same end users—primarily public sector organizations—who purchase and consider for purchase CentralSquare's Public Safety and Justice Unit products.

105.   CentralSquare's trade secrets and confidential information regarding its products, customers, and marketing and sales strategies are highly valuable to both CentralSquare and Defendants.

106.   Upon information and belief, the Departing Employees, with the inducement and knowledge of Defendants, have used and intend to use their knowledge about CentralSquare that they acquired at CentralSquare for the benefit of Defendants.

107.   The Departing Employees all have contractual restrictions designed to protect CentralSquare's confidential information and Trade Secrets.

108.   Despite CentralSquare repeatedly raising concerns in good faith with Oracle regarding its recruitment and hiring activities over the past year, Oracle has continued to knowingly interfere with CentralSquare's contractual and business relations by soliciting and hiring CentralSquare employees away from CentralSquare and seeking to obtain CentralSquare's confidential and trade secrets information.

109.   Through its actions, Oracle has sought to build its public safety and justice division almost exclusively with CentralSquare personnel and proprietary information and at CentralSquare's expense rather than paying for the development of its own executive, design, development, marketing, and sales personnel.

110.   This has caused or will cause CentralSquare damages in the form of, among other things, lost services, lost revenues and profits, lost training costs, and subsequent recruitment costs.

111.   Should Oracle be permitted to continue its raiding of CentralSquare's workforce and encouraging, aiding or abetting the blatant violation of the valid contractual restrictions of former CentralSquare employees that prohibit such solicitation and/or competition with CentralSquare, irreparable harm will be caused to CentralSquare, which CentralSquare diligently sought to prevent.

## COUNT I:  MISAPPROPRIATION AND/OR THREATENED DISCLOSURE OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT

112.   CentralSquare realleges and incorporates by reference Paragraphs 1 - 111 of this Complaint, as if fully set forth herein.

113.   Some or all of CentralSquare's confidential information that has been provided to the Departing Employees constitute "trade secrets" within the meaning of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.* (the "DTSA").

114.   As senior leaders at CentralSquare, Mr. Seoane and Mr. McCarthy acquired and had access to intimate and specific knowledge of CentralSquare's confidential and trade secret information regarding acquisition strategies, customer relationships, sale and marketing strategies, pricing, strategic plans, manufacturing processes, compensation and commission strategies, and financial results.

115.   As a sales director at CentralSquare, Mr. Bradish acquired and had access to intimate and specific knowledge of CentralSquare's confidential and trade secret information regarding customer relationships, sales and marketing strategies, pricing, strategic plans, manufacturing processes, compensation and commission strategies, and financial results.

116.   As senior product leaders, designers, and/or developers at CentralSquare, Mr. Castleton, Mr. Marshall, and Mr. Hanson, acquired and had

access to intimate and specific knowledge of CentralSquare's trade secrets, including product design, development, and specifications.

117.   CentralSquare has taken reasonable efforts to maintain the secrecy of its trade secrets.  Among other things, CentralSquare has required its employees, including the Departing Employees, to enter into various agreements that contain non-disclosure provisions preventing employees from unauthorized use of CentralSquare's trade secret and confidential information.

118.   CentralSquare's trade secrets are not generally known or available to the public or even within the public safety and justice sector of the software industry, and are not readily ascertainable by other, legitimate means.

119.   CentralSquare's trade secrets provide CentralSquare with a competitive advantage in the marketplace.

120.   Defendants have acquired CentralSquare's trade secrets from some or all of the Departing Employees in violation of the Departing Employees' contractual and other legal duties to CentralSquare.

121.   Defendants have used, continue to use, and/or inevitably will use CentralSquare's trade secrets acquired by improper means to unfairly build Defendants' public safety and justice division almost exclusively at CentralSquare's expense without having to pay for the cost of developing this information at its own expense in the marketplace.

122.    At the time of Defendants' acquisition and use of CentralSquare's trade secrets, Defendants knew or had reason to know that their knowledge of CentralSquare's trade secrets was derived from or through a person or persons who owed a duty to CentralSquare to maintain their secrecy and to prevent their use.

123.    Because Oracle is attempting to grow its public safety and justice division with the Departing Employees and to compete directly with CentralSquare, the Departing Employees' employment with and work for Oracle will result in the inevitable disclosure of CentralSquare's trade secrets.

124.    As a direct and proximate result of Defendants' violation of the DTSA, CentralSquare has sustained substantial damages in an amount that will be established at trial of this matter.

125.    Defendants' actions in converting and misappropriating CentralSquare's trade secrets for their own gain were willful, wanton, and malicious, and were taken with reckless disregard for CentralSquare's rights.

126.    Defendants' actions have caused and will continue to cause damages in an amount which will later be determined at trial, but also have caused and will continue to cause CentralSquare irreparable harm if not preliminarily and permanently enjoined.  The irreparable harm to CentralSquare consists of potential loss of business goodwill, misappropriation of trade secrets, and breach of confidentiality, all of which cannot be compensated by money damages.

127.   CentralSquare has no adequate remedy at law because Defendants' actions are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace.

128.   Unless Defendants are preliminarily and permanently enjoined and restrained from using CentralSquare's trade secrets, and are preliminarily and permanently enjoined from conduct which will result in the inevitable disclosure of CentralSquare's trade secrets, CentralSquare will suffer substantial and irreparable injury.

129.   CentralSquare is entitled to temporary, preliminary and permanent injunctive relief and damages based on Defendants' misappropriation, threatened disclosure, and/or inevitable disclosure of CentralSquare's trade secrets.  *See* 18 U.S.C. § 1836(b)(3).

130.   CentralSquare is entitled to preliminary and permanent injunctive relief and damages based on Defendants' raiding of CentralSquare's workforce.

### COUNT II:  MISAPPROPRIATION OF TRADE SECRETS UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT

131.   CentralSquare realleges and incorporates by reference Paragraphs 1 - 130 of this Complaint, as if fully set forth herein.

132.   Some or all of CentralSquare's confidential information that has been provided to the Departing Employees constitute "trade secrets" within the meaning

of the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq.* (the "Florida Trade Secrets Act").

133.   As senior leaders at CentralSquare, Mr. Seoane and Mr. McCarthy acquired and had access to intimate and specific knowledge of CentralSquare's confidential and trade secret information regarding acquisition strategies, customer relationships, sale and marketing strategies, pricing, strategic plans, manufacturing processes, compensation and commission strategies, and financial results.

134.   As a sales director at CentralSquare, Mr. Bradish acquired and had access to intimate and specific knowledge of CentralSquare's confidential and trade secret information regarding customer relationships, sales and marketing strategies, pricing, strategic plans, manufacturing processes, compensation and commission strategies, and financial results.

135.   As senior product leaders, designers, and/or developers at CentralSquare, Mr. Castleton, Mr. Marshall, and Mr. Hanson, acquired and had access to intimate and specific knowledge of CentralSquare's trade secrets, including product design, development, and specifications.

136.   CentralSquare has taken reasonable efforts to maintain the secrecy of its trade secrets.  Among other things, CentralSquare has required its employees, including the Departing Employees, to enter into various agreements that contain

non-disclosure provisions preventing employees from unauthorized use of CentralSquare's trade secret and confidential information.

137.   CentralSquare's trade secrets are not generally known or available to the public or even within the public safety and justice sector of the software industry, and are not readily ascertainable by other, legitimate means.

138.   CentralSquare's trade secrets provide CentralSquare with a competitive advantage in the marketplace.

139.   Defendants have acquired CentralSquare's trade secrets from some or all of the Departing Employees in violation of the Departing Employees' contractual and other legal duties to CentralSquare.

140.   Defendants have used, continue to use, and/or inevitably will use CentralSquare's trade secrets acquired by improper means to unfairly build Defendants' public safety and justice division almost exclusively at CentralSquare's expense without having to pay for the cost of developing this information at its own expense in the marketplace.

141.   At the time of Defendants' acquisition and use of CentralSquare's trade secrets, Defendants knew or had reason to know that their knowledge of CentralSquare's trade secrets was derived from or through a person or persons who owed a duty to CentralSquare to maintain their secrecy and to prevent their use.

142.   Because Oracle is attempting to grow its public safety and justice division with the Departing Employees and to compete directly with CentralSquare, the Departing Employees' employment with and work for Oracle will result in the inevitable disclosure of CentralSquare's trade secrets.

143.   As a direct and proximate result of Defendants' violation of the FTSA, CentralSquare has sustained substantial damages in an amount that will be established at trial of this matter.

144.   Defendants' actions in converting and misappropriating CentralSquare's trade secrets for their own gain were willful, wanton, and malicious, and were taken with reckless disregard for CentralSquare's rights.

145.   Defendants' actions have caused and will continue to cause damages in an amount which will later be determined at trial, but also have caused and will continue to cause CentralSquare irreparable harm if not preliminarily and permanently enjoined.  The irreparable harm to CentralSquare consists of potential loss of business goodwill, misappropriation of trade secrets, and breach of confidentiality, all of which cannot be compensated by money damages.

146.   CentralSquare has no adequate remedy at law because Defendants' actions are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace.

147.   Unless Defendants are preliminarily and permanently enjoined and restrained from using CentralSquare's trade secrets, and are preliminarily and permanently enjoined from conduct which will result in the inevitable disclosure of CentralSquare's trade secrets, CentralSquare will suffer substantial and irreparable injury.

148.   CentralSquare is entitled to temporary, preliminary and permanent injunctive relief and damages based on Defendants' misappropriation, threatened disclosure, and/or inevitable disclosure of CentralSquare's trade secrets.  *See* Fla. Stat. § 688.003.

149.   CentralSquare is entitled to preliminary and permanent injunctive relief and damages based on Defendants' raiding of CentralSquare's workforce.

## COUNT III:  UNJUST ENRICHMENT

150.   CentralSquare realleges and incorporates by reference Paragraphs 1-149 of this Complaint, as if fully set forth herein.

151.   Defendants have wrongfully accepted and retained, and continue to accept and retain, the benefits of the proprietary and valuable trade secret and confidential information misappropriated from CentralSquare.

152.   The circumstances described above are such that it would be inequitable for Defendants to retain the benefit it obtained from CentralSquare without paying for it.

153.   In addition, Oracle has attempted and is attempting to build its public safety and justice division by raiding CentralSquare's employees to obtain their know-how, proprietary information, and relationships that were developed through CentralSquare's investment of time, resources, and expense, which is both unfair and would result in an unjust enrichment.

154.   As a result of Defendants' unjust enrichment, CentralSquare has suffered and/or will continue to suffer irreparable harm and economic damages, including but not limited to lost profits and loss of goodwill and competitive advantage.

## <u>COUNT IV:  TORTIOUS INTERFERENCE WITH CONTRACT</u>

155.   CentralSquare realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 154 of this Complaint.

156.   Defendants intentionally and knowingly interfered with the contractual relationships between CentralSquare and its employees, including by inducing the Departing Employees to breach their agreements.

157.   Defendants have directed, encouraged, or, at the least, knowingly or recklessly permitted some or all of the Departing Employees to breach their contractual obligations to CentralSquare.

158.   Defendants have directed, coordinated, or been complicit in the recruiting of CentralSquare employees in violation of the certain restrictive covenants of the Departing Employees.

159.   Defendants' tortious actions lacked justification, privilege or excuse.

160.   CentralSquare has sustained irreparable harm and will incur substantial damages as a direct and proximate result of Defendants' interference with CentralSquare's contractual relationships.

161.   Unless otherwise restrained by this Court, Defendants will continue their unlawful acts that are irreparably injuring CentralSquare, for which there will be no complete and adequate remedy at law.

162.   CentralSquare will continue to sustain irreparable harm as a direct and proximate result of Defendants' interference with the contractual relationships between CentralSquare and its employees and/or former employees.

163.   CentralSquare is entitled to damages for past violations and to temporary, preliminary and permanent injunctive relief enjoining from interfering with CentralSquare's contractual relations.

## COUNT V:  UNFAIR TRADE PRACTICES

164.   CentralSquare restates and realleges paragraphs 1 through 163 of its Complaint.

165.   Defendants were, at all times relevant to the Complaint, engaged in commerce in the State of Florida.

166.   Defendants' unlawful misappropriation and misuse of CentralSquare's trade secrets and confidential business information, the solicitation of CentralSquare's employees as a means for the misappropriation of CentralSquare's trade secrets and confidential business information, and the other knowing acts and practices alleged in this Complaint constitute unfair or deceptive business practices under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*

167.   In addition, in order to compete unfairly with CentralSquare, Oracle has attempted and is attempting to build its public safety and justice division by raiding CentralSquare's employees to obtain their know-how, proprietary information, and relationships that were developed through CentralSquare's investment of time, resources, and expense, and placing them in positions in which they have and/or will violate their agreements with CentralSquare.   These improper and unfair acts represent unfair business practices under the FDUTPA.

168.   CentralSquare has suffered, and continues to suffer, actual injury in fact due to the deliberate acts by Defendants without regard to CentralSquare's legal, contractual, and exclusive proprietary rights.

169.   CentralSquare is entitled, under Fla. Stat. §§ 501.2105, 501.211, to recover from Defendants its damages, costs and reasonable attorneys' fees.

## *REQUEST FOR INJUNCTIVE RELIEF*

170.   CentralSquare restates and realleges paragraphs 1 through 169 of its Complaint.

171.   CentralSquare has a substantial likelihood of success on at least one of its claims asserted in this Complaint.

172.   Unless Defendants are enjoined from engaging in additional misconduct, CentralSquare will be irreparably harmed in the marketplace by having its confidential and trade secret information improperly, unlawfully and competitively used against it, by loss of key employees, and by loss of customer goodwill.

173.   Such misconduct by Defendants will result in substantial loss, which is unascertainable at this point in time, and future economic loss which presently is incalculable.

174.   CentralSquare has no adequate remedy at law for Defendants' misconduct, as money damages are not adequate to compensate for the ongoing harm caused by Defendants' misconduct.

175.   CentralSquare has a clear legal right to the requested relief.

176.   The public interest favors entry of an injunction to uphold the sanctity of contract, to protect investment in research and development, and to protect trade secrets from unlawful misappropriation.

### JURY DEMAND

CentralSquare hereby requests a jury in this matter.

### PRAYER FOR RELIEF

Wherefore, CentralSquare respectfully prays that this Court:

(a)   grant judgment to CentralSquare and against Defendants as to all Counts of this Complaint;

(b)   grant judgment to CentralSquare and against Defendants on this Complaint for all relief sought by CentralSquare;

(c)   enjoin and restrain Defendants, preliminarily, from, directly or indirectly, soliciting any individual employed by CentralSquare to leave CentralSquare's employment;

(d)   enjoin and restrain all Defendants, permanently, for a period of one year after a final order in this case from directly or indirectly soliciting any individual employed by CentralSquare to leave CentralSquare's employment;

(e)   enjoin and restrain, all Defendants, preliminarily, from disclosing or making use of, directly or indirectly, for themselves or others, any of CentralSquare's trade secrets or confidential information;

(f)    enjoin and restrain, all Defendants, permanently, from disclosing or making use of, directly or indirectly, for themselves or others, any of CentralSquare's trade secrets for as long as such information remains a trade secret;

(g)    enjoin and restrain, all Defendants, permanently for a period of three years after a final order in this case, from disclosing or making use of, directly or indirectly, for themselves or others, any of CentralSquare's confidential information;

(h)    enjoin and restrain Defendants from facilitating the Departing Employees or any other CentralSquare employee from, directly or indirectly, soliciting or inducing, or engaging, hiring, or employing any employee or agent of CentralSquare or its affiliates to terminate his or her relationship with CentralSquare or its affiliates or otherwise interfere with any relationship between CentralSquare, its affiliates, and any of its suppliers, contractors, or customers;

(i)    award CentralSquare damages;

(j)    award CentralSquare costs, expenses, and attorneys' fees incurred in connection with bringing and maintaining this action; and

(k)    grant CentralSquare such additional relief as this Court deems just and equitable.

Respectfully submitted this 1st day of June, 2021.

Respectfully submitted,

  /s/ Juan C. Enjamio
Juan C. Enjamio (FL Bar No. 571910)
E-mail: jenjamio@huntonak.com
HUNTON ANDREWS KURTH LLP
Wells Fargo Center, Suite 2400
333 SE 2nd Avenue
Miami, Florida 33131
Tel:   (305) 810-2500
Fax:   (305) 810 -2460

Kurt A. Powell
(*Pro Hac Vice application forthcoming*)
E-mail: kpowell@huntonak.com
Robert T. Dumbacher
(*Pro Hac Vice application forthcoming*))
E-mail: rdumbacher@huntonak.com
HUNTON ANDREWS KURTH LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street, NE
Atlanta, GA  30308
Telephone:  (404) 888-4000
Facsimile:  (404) 888-4190

*Counsel for Plaintiff CentralSquare Technologies, LLC*